**STATE**

v.

**Theodore BARNES.**

**No. 88–210–CA.**

Supreme Court of Rhode Island.

May 22, 1989.

James E. O'Neil, Atty. Gen., Caroline Cole Cornwell and Nicholas Trott Long, Asst. Attys. Gen., for plaintiff.

Paula Rosin and Barbara Hurst, Asst. Public Defenders, for defendant.

OPINION

MURRAY, Justice.

The defendant, Theodore Barnes (Barnes), appeals from Superior Court convictions on twelve counts of first-degree sexual assault, six counts of an abominable and detestable crime against nature, and one count of kidnaping. The incidents leading to this appeal are set forth below with the exception that the complaining witness shall hereinafter be referred to as Gloria.

On the evening of November 28, 1985, Gloria and her friend Elaine attended a concert at the Providence Civic Center. Before leaving for the show Gloria had two vodka-and-orange-juice screwdrivers. She then drove an acquaintance's car to downtown Providence and parked it in a lot on Orange Street. When the concert ended at approximately 12:30 a.m., Gloria and Elaine went to the No Name Bar on the corner of Weybosset and Dorrance Streets. Inside the barroom Gloria ingested four or five "lines" of cocaine. The two women remained at the No Name Bar until closing time at 1 a.m. Elaine, quite intoxicated, then left the tavern with some friends while Gloria proceeded to a local pizza parlor alone. Finding no one there that she recognized, Gloria started back to the car. As she walked past a Dunkin' Donuts shop, a man loitering near the store said, "Hi, baby, what's up?" Gloria ignored the individual and continued along well-lighted Westminster and Dorrance Streets. The stranger, however, followed closely at her

side and continued to accost her, stating, "Don't worry, I won't molest you. I'm not going to hurt you." Gloria quickened her pace and told the individual to stop harassing her. In response, he requested a ride to Broadway. When Gloria arrived at the car, she unlocked the driver's-side door, entered the vehicle, and started the engine. Turning to her right, she discovered that the man had also entered the car. Once again he requested a ride to Broadway, and Gloria refused. The intruder, reaching into his pocket, then stated that if she refused to comply with his instructions he "had something" for her. Gloria complied.

What happened next is every person's worst nightmare. Gloria was forced to drive to five different locations and engage in numerous sexual acts—vaginal intercourse, fellatio, cunnilingus, and masturbation—the sordid details of which we need not recount. Her assailant also attempted to engage in anal intercourse with Gloria, and when this failed, he penetrated her rectum digitally. After approximately four hours of abuse, Gloria finally escaped her attacker when he fell asleep. She telephoned the Providence police department immediately and reported the incidents of assault. The police transported Gloria to Women and Infants Hospital where she received a medical examination and samples were taken as required in completing a rape kit.

The next day Gloria went to the police station and gave a statement. She described her assailant to Detective George Ritchie as follows:

"[He was] a black guy, about six foot, hundred eighty pounds; had a scar on his right thumb; kind of bald on top, short in the back, kind of like a regular Afro, but bald on top; buck teeth a little bit. About thirty, thirty-five years old. He had on blue jeans, white sneakers, dark sweatshirt, black satin jacket with yellow writing on the left side, tan hat, beret-type hat with a little flap on it; possibly a few days growth."

On December 2, 1985, Detective Ritchie *visited* Gloria at her home and showed her a photographic array of seven individuals roughly matching this description. The defendant's picture was included among this display. Gloria immediately identified Barnes as the man who had raped her. Later that evening, police officers arrested defendant pursuant to a validly issued warrant. Investigating authorities then seized the jeans, maroon knit shirt, and tan cap that defendant wore while in the detention room of the station house. Detective Ritchie also searched Barnes' apartment under authority of a warrant and seized, among other things, a black satin jacket with yellow embroidering, two pairs of white sneakers, and a black sweatshirt. Various physical specimens were lawfully taken from the body of defendant, including hair, saliva, and blood samples.

At trial the state called two expert witnesses from the Federal Bureau of Investigation who could neither conclusively establish nor definitely eliminate Barnes as the rapist. Alan Robillard, an expert in hair and fiber analysis, testified that he had examined certain materials that were present in the car at the time of the assaults and discovered hairs of Negroid origin. Agent Robillard, however, was unable to come to a definitive conclusion in making a comparison between the limited number of hairs found in the materials and those seized from Barnes. William Eubanks, an expert serologist, testified that he had analyzed defendant's blood as well as the semen and blood samples taken from the victim's vagina and various articles of fabric. His examination of these specimens revealed the presence of blood not consistent with Gloria's blood type but consistent with Barnes' blood type. This conclusion, however, was tempered by Eubank's testimony that 20 percent of the black population had Barnes' blood type and 42 percent of blacks had the particular blood enzyme present in these samples.

The state also introduced direct accusatory testimony by Gloria and additional circumstantial evidence against Barnes. Many of the items seized from defendant and his apartment were admitted into evidence. In addition, Barnes—who at the time of the incidents was a thirty-eight-

year-old black man, balding, with a beard, and a scar on his right thumb—generally fit the description of Gloria's assailant. Finally, during the course of the trial Gloria identified Barnes as the individual who had raped her repeatedly that night.

The defendant took the stand in his own behalf. Barnes categorically denied having raped Gloria. The defendant testified that on the night in question he had remained at a friend's house until 11:30 p.m. Barnes then departed for the Green Oak Bar where he consumed four shots of brandy. At approximately midnight, Barnes claimed, he went home and fell asleep after watching television and listening to a police scanner for a brief period. He awoke at 6 a.m. to the reports of two sexual assaults over the scanner. Shortly thereafter Barnes joined a fellow tenant for morning coffee. Two witnesses for the defense substantially buttressed Barnes' testimony. The defense also called several witnesses to testify to defendant's physical appearance and his manner of dress, apparently in an effort to rebut Gloria's description of her attacker.

The trial concluded after seven days of presenting evidence to the jury. Duly tried, Barnes was found guilty of all nineteen counts contained in the indictment. The trial justice denied defendant's motion for a new trial and on January 26, 1988, sentenced Barnes to the following terms at the Adult Correctional Institutions: (1) kidnaping—ten years' imprisonment; (2) first-degree sexual assaults—twenty years to serve, fifteen years suspended, fifteen years' probation upon release; and (4) abominable and detestable crimes against nature—seven years to serve. The sentences were to run concurrently.

With this factual and procedural background in mind, we shall examine the various issues raised by defendant in this appeal.

### Jury Instructions Concerning the Effect of Drug Usage on a Witness' Credibility

■ At trial Gloria candidly admitted during direct and cross-examination that she had ingested anywhere from three to six lines of cocaine prior to the onslaught of attacks. Defense counsel requested a credibility instruction from the trial justice regarding the possible effect of drug usage on a witness' perception and memory of the event leading to prosecution. No evidence was presented at trial, however, concerning the negative effects of cocaine on a user's ability to perceive or recall. Rather, counsel for defendant argued at side bar that it is "common knowledge" that cocaine impairs a person's perception of events. In declining to give the requested instruction to the jury, the trial justice stated, "I really don't have any idea what cocaine does to someone. Whether or not it sharpens their perceptions or diminishes their perceptions." On appeal defendant argues that the trial justice erred in failing to instruct the jury that in considering the credibility of witnesses, it could consider the possible influence of drugs on a witness' ability to perceive and recall accurately the event under scrutiny.

The defendant cites *State v. Carrera*, 528 A.2d 331 (R.I.1987), in support of reversal. In *Carrera*, this court held that

> "evidence of use of drugs is admissible *to show that the witness was under the influence of those drugs at the time of the events to which he or she is testifying.* Such evidence of drug use bears on the question of whether the witness was accurately perceiving the events around him or her, certainly a matter of interest to the finder of fact." *Id.* at 333.

Expanding on our holding in that case, we recently concluded in *State v. Kelly*, 554 A.2d 632, 637 (R.I.1989) that "evidence of the victim's drug use less than twenty-four hours before the alleged assault was reasonably relevant to her ability to perceive and recall the events in question accurately, and was not so inflammatory or prejudicial so as to outweigh its probative value." In both the *Carrera* and *Kelly* decisions we were concerned with a criminal defendant's right to confront and cross-examine a witness on the highly relevant issue of whether that witness was accurately perceiving the events in question

while under the influence of drugs. Nothing in either of these cases, however, indicates that a trial justice is required in every instance to instruct the factfinder on the use of evidence relating to the effect of drug consumption on credibility once that evidence has been properly placed before the jury.

In the instant case, Barnes was allowed to delve into the issue of the victim's drug usage on the night in question during cross-examination of the complainant and in his closing argument. Gloria testified that the cocaine actually heightened her degree of awareness. No expert testimony was introduced at trial concerning cocaine's alleged deleterious effects upon an individual's sensory system or memory. To have given the requested instruction in these circumstances would have been tantamount to the trial justice's rendering an opinion on the possible effects of cocaine upon the complainant. Such an instruction could be construed by the jury as an impermissible comment on the quality or credibility of the evidence by the trial justice. *See State v. Hadrick*, 523 A.2d 441, 444 (R.I.1987); *State v. Olink*, 507 A.2d 443, 447 (R.I.1986) (quoting *State v. Fenner*, 503 A.2d 518, 525 (R.I.1986)).

We are of the opinion that the trial justice correctly declined to recite defendant's requested instructions in circumstances wherein no expert testimony was adduced at trial concerning the effect of cocaine upon an individual's ability to perceive or recall.

### The Out–of–Court Identification

At a pretrial hearing, counsel for defendant moved to suppress the the the fact that Gloria had identified Barnes as her assailant prior to trial. Defense counsel claimed that the photographic array was unduly suggestive because the only individual who remotely fit the description Gloria had given to the police was Barnes. The trial justice rejected this argument and denied defendant's motion to suppress. Consequently the array of photographs was admitted in evidence as a full exhibit, and

testimony was adduced at trial concerning the out-of-court identification.

■ The law in this jurisdiction relating to the admissibility of an out-of-court identification is well settled. Under the two-prong test promulgated by the Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), this court must first determine whether the photographic array was unnecessarily suggestive. *State v. Pulphus*, 465 A.2d 153, 163 (R.I.1983). If we answer this query affirmatively, our attention is then directed to an examination of the totality of the circumstances to assess the independent reliability of the identification. *Id. See State v. Dufault*, 540 A.2d 355, 357 (R.I. 1988).

In accordance with the above-stated *Manson* standard, we turn to the threshold question of whether the photographic array constituted an impermissibly suggestive identification procedure. In finding no violation of Barnes' due-process rights, the trial justice characterized the array of photographs as "excellent." On appeal, defendant argues that the photographic array was so suggestive that it irreparably tainted the reliability of the identification.

The United States Supreme Court has stated that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968). In determining whether a photographic array is susceptible of suggestive misidentification, we compare the physical characteristics of each individual featured in the display to the general description of the suspect given to the police by the victim. There is no requirement that subjects portrayed in the photographs be "look-alikes" so long as they possess the same general characteristics. *State v. Dufault*, 540 A.2d at 357.

We have examined the seven photographs at issue, bearing in mind Gloria's

description of her assailant, and conclude that the array is not suggestive. The individuals depicted in the pictures, including Barnes, are all black men who appear to be within the general age range estimated by the victim. The subjects show some degree of hair loss, albeit with some it is more pronounced than with others. With the exception of one clean-shaven individual, each man has some facial hair. The bust-like photographs do not disclose the height, dental abnormalities, or hands of any subject. We conclude that there was little, if any, chance that the photographic array led to the misidentification of Barnes as the rapist.

■ Although the first aspect of the *Manson* test is dispositive of defendant's appeal on this issue, a precis of the relevant circumstances surrounding the identification also establishes its independent reliability. By virtue of the illumination from street lights and the interior light of the vehicle, Gloria had ample opportunity to observe Barnes for a prolonged period in close quarters. Frightened and alone, she intensely focused her attention on defendant. This is not a case in which a complaining witness observed the perpetrator only briefly under less than favorable conditions. Although she had admittedly ingested two alcoholic drinks and used a moderate amount of cocaine over the course of several hours, Gloria testified that the resultant physiological effect of the illegal substance on her perception was to make her more alert. Her heightened degree of awareness was borne out by the detailed and accurate description of defendant she provided the police. This description included a scar on defendant's right thumb, a fact brought to the attention of the jurors at trial. Four days after the assaults, with the offensive details still fresh in her memory, Gloria positively identified Barnes as the man who had attacked her repeatedly that night.

We conclude that the trial justice properly denied defendant's motion to suppress.

*Kidnaping and the Innis Rule*

■ After the state had rested and again at the close of Barnes' case, counsel for defendant moved for acquittal on the charge of kidnaping. G.L.1956 (1981 Reenactment) § 11–26–1. The trial justice denied both motions. Relying on our holding in *State v. Innis*, 433 A.2d 646 (R.I.1981), *cert. denied*, 456 U.S. 930, 102 S.Ct.1980, 72 L.Ed.2d 447 (1982), defendant urges reversal. The evidence introduced at trial, argues defendant, clearly establishes that the confinement and asportation of the complainant had no independent significance from the rapes but merely facilitated a continuing series of sexual assaults.

In *State v. Innis, supra,* we held that any confinement or forced detention must have some significance independent of another crime with which the defendant is also charged in order to sustain a conviction of kidnaping under § 11–26–1. The evidence adduced at trial in *Innis* indicated that the defendant, armed with a shotgun, had entered a cab and ordered the driver to proceed to East Greenwich. Several days later the cab driver's nude body was discovered in a sparsely populated area of Coventry. He had been shot in the back of the head and robbed.

In tracing the development of the law pertaining to kidnaping, this court held that

"confinements that are incidental to the commission of a crime are not punishable under § 11–26–1. In order to come within the scope of that section, a confinement or imprisonment must have some independent significance. Thus, any movement of a victim during the course of a crime cannot be punished as a kidnapping unless such movement exceeds that necessary to facilitate the crime at hand." *Innis*, 433 A.2d at 655.

Reasoning that the confinement and asportation of the victim had no significance independent of the murder and robbery, we concluded that the trial justice should have granted Innis' motion for acquittal insofar as it pertained to the kidnaping charge.

Two years later we reaffirmed our commitment to the *Innis* rule. In *State v. Lambert*, 463 A.2d 1333, 1340 (R.I.1983), this court reiterated that

"in order to come within the reach of our kidnapping statute, * * * any confinement or imprisonment must have some independent significance, and thus any movement of a victim during the course of a crime cannot be punished as kidnapping unless such movement exceeds that necessary to facilitate the crime at hand."

The facts in *Lambert* established that the two defendants, brandishing an ice pick and a screwdriver, physically forced a female into her automobile. The two men then transported her to several locations throughout Providence. During this one-hour episode, the abductors discussed what to do with their victim. At one location she was robbed, and at another site the defendants sexually assaulted her. This court upheld the kidnaping convictions, stating that "[t]he confinement lasted longer than necessary, and the movement exceeded that necessary to facilitate the crimes of robbery and sexual assault." *Id.*

In the case at bar, it is clear that the confinement and asportation of the victim exceeded the movement necessary to facilitate the sexual assaults. For approximately four hours and at several locations, defendant raped the complainant repeatedly. Throughout this extended period, Barnes kept his leg hooked about Gloria's to prevent her escape from the vehicle. Gloria testified that any thought of absconding was quickly rejected out of fear of physical reprisal from defendant. Having previously promised to free her if she complied with his demands, Barnes continued to hold Gloria captive after completing several assaults. Gloria testified that she had grown concerned over her prolonged confinement despite having yielded to defendant's advances. It was only when Barnes had fallen asleep that she was able to free herself from his grasp.

The trial justice, viewing the evidence in a light most favorable to the state, emphasized several of these factors in denying defendant's motion for judgment of acquittal. His conclusion that the confinement and asportation of the victim had legal significance separate and apart from the sexual assaults is well supported by the evidence of record.

### Double Jeopardy

The Fifth Amendment to the United States Constitution and article I, section 7, of the Rhode Island Constitution protect a criminal defendant from multiple prosecutions for the same offense. *See State v. Gordon,* 508 A.2d 1339, 1345 (R.I.1986). In determining whether an accused has been tried twice for a single incident of criminal conduct, we apply the oft-quoted standard set forth in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *See State v. Pope,* 414 A.2d 781, 787–88 (R.I.1980); *State v. Grullon,* 117 R.I. 682, 686, 371 A.2d 265, 267 (1977). Coined the "same evidence" test by many courts and scholars, the rule as enunciated by the *Blockburger* Court states:

"where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304, 52 S. Ct. at 182, 76 L.Ed. at 309.

The defendant argues that the trial justice violated his constitutional protection against double jeopardy by ruling that he could be convicted of first-degree sexual assault and an abominable and detestable crime against nature when the bases of both those charges were the same sexual acts. The state counters with a somewhat muddied rebuttal. On the one hand, the state appears to argue that the trial justice ruled correctly on this issue. The state then asserts on the other hand that enough evidence was presented at trial from which the jury could have found five instances of fellatio and one incident of cunnilingus—comprising the six counts of an abominable and detestable crime against nature—plus twelve separate and distinct acts of first-degree sexual assault.

We have already accepted as correct the proposition that under the *Blockburger* standard a conviction of an abominable and detestable crime against nature merges

with a first-degree sexual-assault conviction when both counts evolve from a single act of forced sexual penetration. In *State v. Burgess*, 465 A.2d 204, 205 (R.I.1983), we acknowledged the state's concession that this court "should vacate the conviction of committing an abominable and detestable crime against nature because this conviction and the first-degree sexual-assault conviction result from the same forcible-fellatio offense, thereby violating the double-jeopardy clause." Having previously decided the precise point of law raised by defendant in a manner favorable to him, we must next determine whether there is any substance in fact to his argument.

An examination of the record, which consists of eleven volumes comprising 855 pages, discloses that Barnes forced Gloria to engage in five acts of vaginal intercourse, five acts of fellatio, two acts of digital penetration, and one act of cunnilingus,[1] totaling thirteen sexual assaults. The defendant, however, was charged and convicted of twelve counts of first-degree sexual assault and six counts of an abominable and detestable crime against nature, for a total of eighteen sexual offenses.[2] It is apparent then that some, if not all, of the actions underlying the abominable-and-detestable-crime convictions were the same acts that constituted the bases of the first-degree sexual-assault convictions. Indeed,

the trial justice explicitly instructed the jury that it could find Barnes guilty of both crimes for the same forcible-sexual act. In this regard the trial justice committed error.

In accordance with the relief granted in *State v. Anil*, 417 A.2d 1367 (R.I.1980), and *State v. Boudreau*, 113 R.I. 497, 322 A.2d 626 (1974), we reverse the defendant's convictions on the abominable-and-detestable-crime-against-nature counts as violative of the prohibition against double jeopardy. Since Barnes received concurrent sentences on all counts, the length of time which he must serve will remain unchanged.

Accordingly the defendant's appeal as it pertains to the first-degree sexual-assault convictions on counts 2, 4, 5, 6, 8, 10, 11, 13, 14, 15, 17, 18, and the conviction of kidnaping on count 1 is denied and dismissed. The judgment appealed from in regard to these counts is affirmed. Barnes' appeal insofar as it relates to the counts of abominable-and-detestable-crime-against-nature convictions is sustained since under *Blockburger*, as applied in *Burgess*, they are treated as merged. The papers in this case are remanded to the Superior Court with direction to vacate the convictions on counts 3, 7, 9, 12, 16, and 19 for the abominable and detestable crime against nature.

---

1. The complainant testified to two acts of cunnilingus; however, both the indictment and the verdict form charged Barnes with committing only one act of this particular abominable and detestable crime against nature. *See* Appendix, Indictment No. Pl/86–0983A; Verdict Form, Indictment No. 86–983. Limiting ourselves to the specific charges levied against defendant, the additional act of cunnilingus testified to by Gloria is irrelevant to the determination of whether defendant's double-jeopardy protection was violated.

2. The sexual-assault counts are general in nature and provide no indication of what acts constitute the bases of these charges. *See* Appendix, *infra.*

## APPENDIX
### IN THE SUPERIOR COURT FOR ...HE
### STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
PROVIDENCE _____ COUNTY

$+.$ /C

**STATE OF RHODE ISLAND**

V. **IND. NO.** P1/86-0983A

THEODORE BARNES, alias John Doe

The Grand Jury of the State of Rhode Island and Providence Plantations charges that on or about the ____28th____ day of ___November, 19 85 at __Providence, in the County of ___Providence____ , __THEODORE BARNES____ , alias John Doe. of Providence County, did,without lawful authority, forceably seize, confine, inveigle and kidnap , with intent to cause

to be imprisoned and secretly confined within this State against her will, in violation of §11-26-1 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

COUNT 2.

That, THEODORE BARNES, alias John Doe.,of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did engage in sexual penetration with , by force and coercion, in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

COUNT 3.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did commit the abominable and detestable crime against nature, to wit,fellatio,upon ,in violation of §11-10-1 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

COUNT 4.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did engage in sexual penetration with , by force and coercion, in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

COUNT 5.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did engage in sexual penetration with , by force

ASSISTANT ATTORNEY GENERAL

APR ..

Proni .. Denot
.. Clerk

and coercion, in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

### COUNT 6.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did engage in sexual penetration with , by force and coercion, in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

### COUNT 7.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did commit the abominable and detestable crime against nature, to wit, cunnilingus, upon , in violation of §11-10-1 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

### COUNT 8.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did engage in sexual penetration with . by force and coercion, in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

### COUNT 9.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did commit the abominable and detestable crime against nature, to wit, fellatio, in violation of §11-10-1 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

### COUNT 10.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence did engage in sexual penetration with , by force and cocercio: in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

### COUNT 11.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did engage in sexual penetration with by force and coercion, in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

### COUNT 12.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did commit the abominable and detestable crime against nature, to wit, fellatio, upon , in violation of §11-10-2 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

### COUNT 13.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did engage in sexual penetration with by force and coercion, in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981)

### COUNT 14.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did engage in sexual penetration with by force and coercion, in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

### COUNT 15.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did engage in sexual penetration with by force and coercion, in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

### COUNT 16.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence,

did commit the abominable and detestable crime against nature, to wit, fellatio, upon , in violation of §11-10-1 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

COUNT 17.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did engage in sexual penetration with by force and coercion, in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

COUNT 18.

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did engage in sexual penetration with by force and coercion, in violation of §11-37-2 and §11-37-3 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

COUNT 19,

That, THEODORE BARNES, alias John Doe, of Providence County, on or about the 28th day of November, 1985, at Providence, in the County of Providence, did commit the abominable and detestable crime against nature, to wit, fellatio, in violation of §11-10-1 of the General Laws of Rhode Island, 1956, as amended, (Reenactment of 1981).

ASSISTANT ATTORNEY GENERAL
WILLIAM P. DEVEREAUX

_[signatures]_

Sylvia Whitley

_James Diffley_
FOREMAN

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, Sc. SUPERIOR COURT

STATE OF RHODE ISLAND :
 :
 v. : IND. NO. 86-983
 :
THEODORE BARNES :

### VERDICTS

#### COUNT 1

On the charge that the defendant did kidnap
, the jury find him

GUILTY [✓] NOT GUILTY [ ]

#### COUNT 2

On the charge that the defendant did engage in sexual
penetration with , the jury find him

GUILTY [✓] NOT GUILTY [ ]

#### COUNT 3

On the charge that the defendant did commit fellatio
upon , the jury find him

GUILTY [✓] NOT GUILTY [ ]

#### COUNT 4

On the charge that the defendant did engage in sexual
penetration with , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 5

On the charge that the defendant did engage in sexual penetration with _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 6

On the charge that the defendant did engage in sexual penetration with _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 7

On the charge that the defendant did commit cunnilingus upon _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 8

On the charge that the defendant did engage in sexual penetration with _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 9

On the charge that the defendant did commit fellatio upon _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 10

On the charge that the defendant did engage in sexual penetration with _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 11

On the charge that the defendant did engage in sexual penetration with _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 12

On the charge that the defendant did commit fellatio upon _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 13

On the charge that the defendant did engage in sexual penetration with _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 14

On the charge that the defendant did engage in sexual penetration with _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 15

On the charge that the defendant did engage in sexual penetration with _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

### COUNT 16

On the charge that the defendant did commit fellatio upon _____ , the jury find him

GUILTY [✓] NOT GUILTY [ ]

## COUNT 17

On the charge that the defendant did engage in sexual penetration with , the jury find him

GUILTY ☑ NOT GUILTY ☐

## COUNT 18

On the charge that the defendant did engage in sexual penetration with , the jury find him

GUILTY ☑ NOT GUILTY ☐

## COUNT 19

On the charge that the defendant did commit fellatio upon , the jury find him

GUILTY ☑ NOT GUILTY ☐

_Scott A Fraser_
Foreperson